**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**September 2, 2025**

# In the Court of Appeals of Georgia

A25A1185. ZELAYA v. THE STATE.

HODGES, Judge.

A jury found Jordy Zelaya guilty of all counts in a 30-count indictment, including two counts of felony fleeing, two counts of aggravated assault with a firearm, possession of a firearm by a convicted felon, two counts of obstruction of law enforcement officers, two counts of misdemeanor fleeing, and 21 counts of misdemeanor traffic offenses. Zelaya appeals following the denial of his motion for new trial. He alleges that the evidence was insufficient to support his convictions for both counts of aggravated assault with a firearm and his conviction for driving with a suspended license. He further asserts that three of his misdemeanor traffic offenses should have merged into one of his felony fleeing convictions. For the reasons that

follow, we affirm Zelaya's convictions for aggravated assault and his misdemeanor traffic offense sentences. However, we reverse his conviction for driving with a suspended license.

Viewed in the light most favorable to support the judgment,[1] the relevant evidence for purposes of this appeal showed that Sergeant William Wright was on patrol in the early morning hours of September 7, 2021, when he noticed a white Suburban "[come] up from behind [him] fast and then slow[] when it saw [him]." When the vehicle passed him, Wright noticed that the vehicle had a broken taillight. Wright activated his blue lights to stop the vehicle; however, the vehicle "took off." Wright chased the vehicle, notified dispatch of the pursuit, and activated his siren in addition to the blue lights, but the vehicle still did not stop. During the flight, the vehicle committed a number of traffic offenses, including running stop signs and red lights, driving on the wrong side of the road, and speeding. The pursuit was joined by Sergeant Blake Bradley, and his patrol car also had its lights and siren activated. Eventually, the vehicle struck a barrier and stopped, but the driver backed up and again fled until he hit an embankment and crashed. The total pursuit covered

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

approximately 12-13 miles, and a videotape of the pursuit via Wright's patrol car camera was played for the jury.

Sergeant Shawn Bond and Lieutenant Garrett Guest testified at trial that they responded to Wright's radio dispatch and joined the pursuit with their patrol cars. They were among the first officers to arrive at the crash scene. Both officers saw the driver exit the vehicle and told the driver to show his hands and get on the ground. The driver, however, "turned and went back in the vehicle[.]" Bond believed the driver was going back into the vehicle to get a weapon. According to both officers, when the driver came back out of the vehicle, he "produced a handgun." Bond testified that he ordered the driver to stop, but the driver "actually raised the pistol at me and my lieutenant . . . at which time [Bond] dove behind [his] patrol car for cover." Bond testified that he feared for his life when he dove for cover: "When he pointed a gun at me and my lieutenant, you know, at that point I moved to cover because I feared for my life, that he was going to shoot us." Guest likewise testified that when the driver came back out of the vehicle "in a very fast motion[,]" "the first thing he did was he spun towards us and stuck his hand out towards us, his right hand, like this (indicating) with something black in his hand." Guest believed the driver was

pointing a gun at them and they were in danger, and Bond verbally said, "he's got a gun[,]" and both officers ducked for cover behind a patrol car.

When the officers came out from behind the patrol car, they did not see anything in the driver's hands. The officers gave verbal commands for the driver to drop to his knees and keep his hands up because, according to Bond, "we knew that the firearm fell somewhere on the ground." The driver, however, "would have his hands raised at one point . . . but then he would also reach down . . . kind of patting and searching with his hands the grass area around him." Bond assumed that the driver was looking for the firearm, so he kept commanding the driver to keep his hands up. This happened several times until Bond and Guest were close enough to deploy their tasers. After the driver was handcuffed, Guest asked Bond whether the driver had pointed a gun at them, and Bond responded, "I don't know." Guest explained that given the heat of the moment he believed he saw a gun, but then the driver did not have a gun when he looked back up, so Guest was not sure what to think. However, one of the officers located a gun "pretty much right where [the driver] was squatting down[.]" Video from Guest's dash camera was admitted into evidence and played for the jury. It reflects Bond shouting "gun, gun, gun" as the driver came out of the

4

vehicle a second time. Both Bond and Guest identified Zelaya in court as the driver of the vehicle who pointed the gun at them.

A jury found Zelaya guilty of all 30 counts in the indictment. Zelaya filed a motion for new trial, which the trial court denied. This appeal followed.

1. Zelaya first asserts that the evidence was insufficient to support his two convictions for aggravated assault, arguing that the evidence only supported convictions for the lesser included offense of pointing a pistol at the officers. We disagree.

Count One charged Zelaya with the offense of aggravated assault in that he "did knowingly make an assault upon the person of Shawn Bond, a public safety officer, with a gun, an object which when used offensively against a person is likely to result in serious bodily injury, while said officer was engaged in the performance of his official duties, in violation of OCGA [§] 16-5-21[.]" Count Two charged Zelaya with committing the same actions against Guest.

A person can commit the offense of aggravated assault in a number of ways, including assaulting an individual "[w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually

5

does result in serious bodily injury[.]" OCGA § 16-5-21 (a) (2). An assault occurs when an individual "either . . . [a]ttempts to commit a violent injury to the person of another; or . . . [c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a) (1), (2). The misdemeanor offense of pointing a pistol at another, on the other hand, is committed when an individual "intentionally and without legal justification points or aims a gun or pistol at another, whether the gun or pistol is loaded or unloaded." OCGA § 16-11-102. The element of assault is what differentiates the felony offense of aggravated assault from the misdemeanor offense of pointing a pistol because pointing a pistol at another does not involve placing the victim in reasonable apprehension of immediately receiving a violent injury. *Rhodes v. State*, 257 Ga. 368, 369-370 (5) (359 SE2d 670) (1987); *Watson v. State*, 199 Ga. App. 825, 827 (3) (406 SE2d 509) (1991). "[I]f the pointing of the firearm placed the victim in reasonable apprehension of immediate violent injury, the felony of aggravated assault has occurred." *Rhodes*, 257 Ga. at 370 (5).

Zelaya's act was clearly the felony of aggravated assault in this case. The testimony showed that both Bond and Guest believed Zelaya had a weapon, and they

ducked for cover because they believed they were in danger. A weapon was subsequently found near Zelaya after his arrest. The fact that the officers, after the incident, may have questioned whether they initially saw a gun in the heat of the moment does not alter the fact that Zelaya never denies that he possessed and pointed a firearm at the officers. In arguing that his conviction should have been for pointing a pistol at another, Zelaya concedes that he did, indeed, have a gun and point it at the officers. The only question was whether the officers were in reasonable apprehension of immediate violent injury, and the facts demonstrate that they clearly were in this case. The evidence was sufficient to support Zelaya's convictions for aggravated assault against Bond and Guest.

2. Zelaya next argues that his two convictions for reckless driving (Counts 20 and 22) and one of his convictions for improper driving on a divided highway (Count 23) should have merged into one of his convictions for fleeing or attempting to elude a police officer (Count 21). Zelaya concedes, however, that "[t]his Court has held that the statute governing sentencing for felony fleeing or attempting to elude precludes [a] trial court from merging that offense with any other. *Buggay v. State*, 263 Ga. App. 520, [523 (2) (588 SE2d 244] (2003); OCGA § 40-6-395 (b) (5) (B) (1995)."

(Footnote omitted.) Indeed, the applicable statute at the time Zelaya committed the offenses, which mirrors a differently numbered division in the current statute (see OCGA § 40-6-395 (d)), specifically states as follows: "Following adjudication of guilt or imposition of sentence for a violation of [fleeing or attempting to elude a police officer], the sentence shall not be suspended, probated, deferred, or withheld, and the charge shall not be reduced to a lesser offense, merged with any other offense, or served concurrently with any other offense." OCGA § 40-6-395 (b) (5) (B) (1995). The trial court did not err in refusing to merge Counts 20, 22, and 23 into Count 21.

3. Finally, Zelaya asserts that the evidence was insufficient to support his Count 29 conviction for driving with a suspended license under OCGA § 40-5-121 (a)[2] because the State failed to prove that he was notified of his license suspension. We agree.

As Zelaya correctly points out, "[n]otice of suspension is an essential element of proving [a] violation for driving on a suspended license." It is well settled that "[i]n order to establish the offense of driving with a suspended license, the State must show

---

[2] OCGA § 40-5-121 (a) imposes penalties on "any person who drives a motor vehicle on any public highway of this state without being licensed as required by subsection (a) of Code Section 40-5-20 or at a time when his or her privilege to so drive is suspended, disqualified, or revoked[.]"

that the accused was driving, that his license was suspended, and that the accused had received actual or legal notice of the suspension." (Citation and punctuation omitted.) *Thelusma v. State*, 356 Ga. App. 495, 498 (1) (c) (847 SE2d 852) (2020).

Here, a certified copy of Zelaya's driver's history from the Georgia Department of Driver Services was admitted into evidence, and it showed that Zelaya's license had been suspended on October 25, 2020 based on his failure to appear for a trial or court appearance. In addition, one of the officers testified at trial as to the contents of the record and stated that Zelaya's license had not been reinstated when the offenses at issue occurred in September 2021. Nevertheless, that same Department of Driver Services document was blank after both the headings labeled "Served Date" and "Served Type[.]" Moreover, another certified Georgia Department of Driver Services form included two checked boxes: one stating, "There is no information on record that indicates licensee has been served[,]"and another stating, "There are no notices available for this record." The State did not introduce any evidence into the record showing that Zelaya had received notice of his license suspension.

The State argues that Zelaya had received notice of his license suspension by operation of law due to his prior traffic citation, citing OCGA § 40-5-56 (a) (2020).[3] Indeed, OCGA § 40-5-56 (a) (2020) sets out a requirement that a traffic citation "shall include language . . . that failure to appear and respond to such citation shall result in the suspension of the violator's driver's license or nonresident driving privilege" and that such language on the traffic citation "shall be sufficient notice of said suspension to support a conviction for a violation of Code Section 40-5-121 if such person drives subsequent to the imposition of such a suspension following his or her failure to appear[.]"[4] What the State fails to recognize is the next conditional statement of the statute:

> *provided, however*, that the department shall send notice of any suspension imposed pursuant to this Code section via certified mail or

---

[3] The 2020 version of the statute applies to the offense which occurred in September 2021. See *Torres v. State*, 361 Ga. App. 149, 154 (3) (863 SE2d 399) (2021) ("[I]n general, a crime is to be construed and punished according to the provisions of the law existing at the time of its commission.") (citation and punctuation omitted).

[4] The General Assembly subsequently amended OCGA § 40-5-56 (a) in 2022 to add a phrase to a sentence not at issue in this case and to state that "[t]he department shall include language in the uniform traffic citation stating that failure to appear and respond to such citation *may* result in the suspension of the violator's driver's license or nonresident driving privilege." (Emphasis supplied.) The remainder of the current statute mirrors the 2020 version.

certificate of mailing to the address reflected on its records as the person's mailing address. For purposes of this subsection, the term "certificate of mailing" means a delivery method utilized by the United States Postal Service which provides evidence that an item has been sent and the date such item was accepted. (Emphasis supplied.)

There is no evidence that the department sent Zelaya notice of his license suspension as required by the statute and our case law.

"[A]s in every criminal prosecution, the State must prove every element of its case beyond a reasonable doubt." (Citation omitted.) *Keller v. State*, 247 Ga. App. 599, 601 (2) (544 SE2d 511) (2001). "Absent proof by the State of actual or legal notice to the defendant a conviction for driving with a suspended license cannot be sustained." (Citation and punctuation omitted.) *Farmer v. State*, 222 Ga. App. 591, 592 (474 SE2d 760) (1996). Based on the evidence in the record, "[w]e are constrained to agree with [Zelaya] that the evidence presented in this case falls short of establishing beyond a reasonable doubt that at the time of the arrest [Zelaya] had received either actual or legal notice that his license had been suspended." *Keller*, 247 Ga. App. at 601 (2). Accordingly, the jury had no evidence before it on which to determine an essential element of the State's case, namely that Zelaya had received notice of his license

suspension. Zelaya's Count 29 conviction for driving with a suspended license must be reversed.

In summary, we affirm Zelaya's Count One and Count Two convictions for aggravated assault against Bond and Guest. We also affirm the trial court's sentencing for Counts 20-23, finding that the court was precluded from merging Zelaya's conviction for felony fleeing or attempting to elude a police officer with any other traffic offense. However, we reverse Zelaya's Count 29 conviction for driving with a suspended license.

*Judgment affirmed in part and reversed in part. McFadden, P. J., and Pipkin, J., concur.*